JOHNSON ET AL. *v.* MISSISSIPPI ET AL.

No. 73–1531.   Argued February 26, 1975—Decided May 12, 1975

*Frank R. Parker* argued the cause for petitioners. With him on the brief were *J. Harold Flannery* and *Paul R. Dimond.*

*Ed Davis Noble, Jr.,* Special Assistant Attorney General of Mississippi, argued the cause for respondents. With him on the brief were *A. F. Summer,* Attorney General, and *William A. Allain,* First Assistant Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

This case concerns the application of 28 U. S. C. § 1443 (1), permitting defendants in state cases to remove the proceedings to the federal district courts under certain conditions, in the light of Title I of the Civil Rights Act of 1968, § 101 (a), 82 Stat. 73, 18 U. S. C. § 245.

## I

During March 1972, petitioners, six Negro citizens of Vicksburg, Miss., along with other citizens of Vicksburg, made various demands upon certain merchants and city officials generally relating to the number of Negroes employed or serving in various positions in both local government and business enterprises. In late March, petitioners began picketing some business establishments in Vicksburg and urging, by word of mouth and through leaflets, that the citizens of Vicksburg boycott those establishments until such time as petitioners' demands were realized.[1] On May 2, 13, 14, and 21 of that year, petitioners, along with 43 other Negroes, were arrested [2] on the basis of warrants charging, in general terms, their complicity in a conspiracy unlawfully to bring about a boycott of merchants and businesses.[3] At least some

---

[1] With respect to these business establishments, the specific demands made by the petitioners were that 40% of their employees and managers should be drawn from the Negro community.

[2] All of the petitioners were arrested on May 2, 1972; petitioners Albert Johnson, Eddie McBride, Charles Chiplin, and James Odell Dixon were arrested again on either May 13 or 14, and petitioner Johnson was arrested once again on May 21.

[3] The warrants were supported by the sworn affidavits of the Vicksburg chief of police and charged various persons among the total of 49 eventually arrested

"with the felonious intent on their part, and each of them to commit acts injurious to trade or commerce among the public and did wilfully, unlawfully, and feloniously conspire, combine, confederate

of these arrests took place at a time when some of those arrested were engaged in picketing in protest of the racial discrimination allegedly practiced by certain merchants of Vicksburg. Following the arrests, which were made by Vicksburg police officers, those arrested were transported to the city jail where they each remained after processing until the posting of bail. There is no indication in the record in this case that the arrests and subsequent detentions of petitioners or the other 43 persons so arrested and detained involved the application of any force by the arresting officers beyond the verbal directions issued by those officers and the coercive custody normally incident to arrest, processing, and detention.

On May 25, 1972, those arrested filed a petition in the Federal District Court in compliance with the procedures established by 28 U. S. C. § 1446 seeking transfer of the trial of charges against them to the District Court pursuant to 28 U. S. C. § 1443, which reads, in pertinent part,[4] as follows:

"Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

and agree among themselves and each of them with the other, and did enter into an unlawful conspiracy, plan and design among themselves, and each with the other, to unlawfully and feloniously bring about a boycott of merchants and businesses and pursuant of the said unlawful conspiracy did then and there promote, encourage and enforce acts injurious to trade or commerce among the public."

[4] Although the petitioners pleaded § 1443 generally, they made no suggestion that any among them was in the position to claim the protection of § 1443 (2) as construed by our decision in *City of Greenwood* v. *Peacock*, 384 U. S. 808, 815–824 (1966), nor do they press such a claim in this Court.

"(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof . . . ."

In their removal petition, it was alleged, *inter alia,* that those arrested were being prosecuted under several state conspiracy statutes[5] which were "on their face and as applied repugnant to the Constitution . . . ," and that:

"The charges against petitioners, their arrest, and subsequent prosecution on those charges have no basis in fact and have been effectuated solely and exclusively for the purpose and effect of depriving petitioners of their Federally protected rights, including by force or threat of force, punishing, injuring, intimidating, and interferring [*sic*], or attempting to punish, injure, intimidate, . . . and interfere with petitioners, and the class of persons participating in the . . . boycott and demonstrations, for the exercise of their rights peacefully to protest discrimination and to conduct and publicize a boycott which seeks to remedy the denial of equal civil rights . . . which activities are protected by 18 U. S. C. [§] 245."

On December 29, 1972, after an evidentiary hearing was held by the District Court in which testimony was

---

[5] At the time the removal petition was filed, the precise statutes under which prosecutions might eventually be brought were apparently unknown to petitioners and the other persons arrested. In their amended petition filed in the District Court, petitioners claimed that they were to be prosecuted under "[c]onspiracy statutes 2056 and all other conspiracy statutes as well as 2384.5 . . . ." The reference to "2056" is an apparent reference to § 2056 of the 1942 Code, now recodified as Miss. Code Ann. § 97–1–1 (1972). The reference to "2384.5" is an apparent reference to § 2384.5 of the 1942 Code, now recodified as Miss. Code Ann. § 97–23–83 (1972).

presented both by petitioners and the Vicksburg chief of police, who was one of the named respondents to the removal petition, the District Court remanded the prosecutions to the state courts. The Court of Appeals affirmed,[6] reasoning that § 245, as a criminal statute, "confers no rights whatsoever . . . ," 488 F. 2d 284, 287 (CA5 1974), and that, under this Court's decisions in *Georgia* v. *Rachel,* 384 U. S. 780 (1966), and *City of Greenwood* v. *Peacock,* 384 U. S. 808 (1966), a federal statute must "provide" for the equal rights of citizens before it can be invoked as a basis for removal of prosecutions under § 1443 (1). Rehearing and rehearing en banc, Fed. Rule App. Proc. 35, were denied, five Circuit Judges dissenting in an opinion.[7] 491 F. 2d 94 (CA5 1974). We granted certiorari, 419 U. S. 893 (1974), and, for reasons stated below, affirm the judgment of the Court of Appeals.

---

[6] After filing a notice of appeal, petitioners applied to the District Court for a stay of its mandate remanding the prosecutions to the state courts, which stay was denied. The record does not indicate that a stay was sought at that point from the Court of Appeals, the prosecutorial process proceeding in its normal fashion until March 1973, when the grand jury having cognizance over the charges "no billed" the charges against 43 of the persons having been previously arrested. App. 140. That same grand jury at the same time returned indictments against the six remaining persons, petitioners here; two of the petitioners were indicted for violation of Miss. Code Ann. § 97–23–83 (1972), and the other four with violation of Miss. Code Ann. § 97–23–85 (1972). Tr. of Oral Arg. 26.

[7] Shortly after the Court of Appeals denied a petition for rehearing en banc, 491 F. 2d 94 (CA5 1974), that court granted an application for a stay of its mandate to petitioners for purposes of their seeking a writ of certiorari in this Court, that stay being effective until disposition of the case by this Court. Since that time the prosecution of petitioners on the indictments handed down by the grand jury has not gone forward.

## II

Our most recent cases construing § 1443 (1) are the companion cases of *Georgia* v. *Rachel, supra,* and *City of Greenwood* v. *Peacock, supra.* Those cases established that a removal petition under 28 U. S. C. § 1443 (1) must satisfy a two-pronged test. First, it must appear that the right allegedly denied the removal petitioner arises under a federal law "providing for specific civil rights stated in terms of racial equality." *Georgia* v. *Rachel, supra,* at 792. Claims that prosecution and conviction will violate rights under constitutional or statutory provisions of general applicability or under statutes not protecting against racial discrimination, will not suffice. That a removal petitioner will be denied due process of law because the criminal law under which he is being prosecuted is allegedly vague or that the prosecution is assertedly a sham, corrupt, or without evidentiary basis does not, standing alone, satisfy the requirements of § 1443 (1). *City of Greenwood* v. *Peacock, supra,* at 825.

Second, it must appear, in accordance with the provisions of § 1443 (1), that the removal petitioner is "denied or cannot enforce" the specified federal rights "in the courts of [the] State." This provision normally requires that the "denial be manifest in a formal expression of state law," *Georgia* v. *Rachel, supra,* at 803, such as a state legislative or constitutional provision, " 'rather than a denial first made manifest at the trial of the case.' " *Id.,* at 799. Except in the unusual case where "an equivalent basis could be shown for an equally firm prediction that the defendant would be 'denied or cannot enforce' the specified federal rights in the state court," *id.,* at 804, it was to be expected that the protection of federal constitutional or statutory rights could be

effected in the pending state proceedings, civil or criminal. Under § 1443 (1),

> "the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court." *City of Greenwood* v. *Peacock, supra,* at 828.

In *Rachel,* the allegations of the petition for removal were held to satisfy both branches of the rule. The federal right claimed arose under §§ 201 (a) and 203 (c) of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a (a) and 2000a–2 (c). Section 201 (a) forbids refusals of service in, or exclusions from, public accommodations on account of race or color; and § 203 (c) prohibits any "attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 . . . ." The removal petition fairly alleged that the prosecutions sought to be removed from state court were brought and would be tried "solely as the result of peaceful attempts to obtain service at places of public accommodation." 384 U. S., at 793.[8] We concluded that if the allegations in the removal petition were true, the defendants by being prosecuted under a state criminal trespass law would be denied or could not enforce their rights in the courts of Georgia, since the "burden of having to defend the prosecutions is itself the denial of a right explicitly conferred by the Civil Rights Act of 1964." *Id.,* at 805.

In *Peacock,* on the contrary, the state-court defend-

---

[8] We had earlier construed § 203 (c) as prohibiting "prosecution of any person for seeking service in a covered establishment, because of his race or color." *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 311 (1964).

ants petitioning for removal were being prosecuted for obstructing public streets, assault and battery, and various other local crimes.[9] The federal rights allegedly being denied were said to arise under the Constitution as well as under 42 U. S. C. §§ 1971 and 1981, the former section guaranteeing the right to vote without discrimination on the grounds of race or color and forbidding interference therewith, and the latter guaranteeing all persons equal access to specified rights enjoyed by white persons.[10]  The Court assumed that the claimed statu-

---

[9] "The several defendants were charged variously with assault, interfering with an officer in the performance of his duty, disturbing the peace, creating a disturbance in a public place, inciting to riot, parading without a permit, assault and battery by biting a police officer, contributing to the delinquency of a minor, operating a motor vehicle with improper license tags, reckless driving, and profanity and use of vulgar language." 384 U. S., at 813 n. 5.

[10] Title 42 U. S. C. § 1971 reads, in pertinent part:

"(a) (1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State . . . to the contrary notwithstanding.

.        .        .        .        .

"(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose . . . ."

We take note of the similarity between the language of § 1971 (b) set out above and the comparable language of § 245 (b) as set out in n. 11, infra.

Title 42 U. S. C. § 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject

tory rights were within those rights contemplated by § 1443 (1), but went on to hold that there had been no showing that petitioners would be denied or could not enforce their rights in the state courts. The removal petitions alleged "(1) that the defendants were arrested by state officers and charged with various offenses under state law because they were Negroes or because they were engaged in helping Negroes assert their rights under federal equal civil rights laws, and that they are completely innocent of the charges against them, or (2) that the defendants will be unable to obtain a fair trial in the state court." 384 U. S., at 826. The Court held, however, that it was not enough to support removal to allege that "federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court." *Id.*, at 827. Petitioners could point to no federal law conferring on them the right to engage in the specific conduct with which they were charged; and there was no "federal statutory right that no State should even attempt to prosecute them for their conduct." *Id.*, at 826.

### III

With our prior cases in mind, it is apparent, without further discussion, that removal under § 1443 (1) was not warranted here based solely on petitioners' allegations that the statutes underlying the charges against them were unconstitutional, that there was no basis in fact for those charges, or that their arrest and prosecution otherwise denied them their constitutional rights. We are also convinced for the following reasons that

to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

§245,[11] on which petitioners principally rely, does not furnish adequate basis for removal under § 1443 (1) of these state prosecutions to the federal court.

Whether or not § 245, a federal criminal statute, provides for "specific civil rights stated in terms of racial equality . . . ," *Georgia* v. *Rachel*, 384 U. S., at 792, it

---

[11] Title 18 U. S. C. § 245, in relevant part, provides:

"(b) Whoever, whether or not acting under color of law, *by force or threat of force* willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

. . . . .

"(2) any person because of his race, color, religion or national origin and because he is or has been—

. . . . .

"(C) applying for or enjoying employment, or any perquisite thereof, by any private employer . . .

. . . . .

"(4) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

"(A) participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in [subparagraph (2)(C)]; or

"(B) affording another person or class of persons opportunity or protection to so participate; or

"(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in [subparagraph 2 (C)], *or participating lawfully in speech or peaceful* assembly opposing any denial of the opportunity to so participate—

"shall be fined . . . ." (Emphasis added.)

This truncated quotation of § 245 merely focuses on that activity, enumerated in subparagraph (2)(C), which would appear to be most closely connected to both the activity in which some defendants were engaged when actually arrested and the activity to which the state charges most closely relate. We recognize that the defendants' picketing during the several months relevant expressed their dissatisfaction with what they contended to be racial discrimination in areas other than private employment.

evinces no intention to interfere in any manner with state criminal prosecutions of those who seek to have their cases removed to the federal courts. On the contrary, § 245 (a)(1) itself expressly provides:

"Nothing in this section shall be construed as indicating an intent on the part of Congress to prevent any State . . . from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section . . . ." [12]

The Mississippi courts undoubtedly have jurisdiction over conspiracy and boycott cases brought under state law; and § 245 (a)(1) appears to disavow any intent to interrupt such state prosecutions, a conclusion that is also implicit in the operative provisions of that section. Section 245 (b) makes it a crime for any persons, by "force or threat of force" to injure, intimidate, or interfere with any individual engaged in specified activities. The provision on its face focuses on the use of force, and its legislative history confirms that its central purpose was to prevent and punish *violent* interferences with the exercise of specified rights and that it was not aimed at interrupting or frustrating the otherwise orderly processes of state law.

Section 245, which was Title I of the Civil Rights Act of 1968, was the antidote prescribed by Congress to deter and punish those who would forcibly suppress the free exercise of civil rights enumerated in that statute. The bill which eventually became Title I, H. R. 2516, was substantially identical to H. R. 14765, passed by the

---

[12] Section 245 (a)(1) goes on to negative any intent by Congress to foreclose state prosecution of the acts forbidden by that section: "nor shall anything in this section be construed as depriving State and local law enforcement authorities of responsibility for prosecuting acts that may be violations of this section and that are violations of State and local law."

House as Title V of the Civil Rights Act of 1966.[13] Title I was enacted against a background of racial violence described in the Report of the bill that was adopted by the House:

> "The brutal crimes committed in recent years against Negroes exercising Federal rights and against white persons who have encouraged or aided Negroes seeking equality need no recital. Violence and threats of violence have been resorted to in order to punish or discourage Negroes from voting, from using places of public accommodation and public facilities, from attending desegregated schools, and from engaging in other activities protected by Federal law. Frequently the victim of the crime has recently engaged or is then engaging in the exercise of a Federal right. In other cases, the victim is a civil rights worker—white or Negro—who has encouraged others to assert these rights or engaged in peaceful assembly opposing their denial. In still other cases Negroes, not known to have had anything to do with civil rights activities, have been killed or assaulted to discourage other Negroes from asserting their rights." H. R. Rep. No. 473, 90th Cong., 1st Sess., 3–4 (1967).[14]

[13] The Proposed Civil Rights Act of 1966, while it passed the House, did not pass the Senate.

[14] This Report stated: "The bill is intended to strengthen the Government's capability to meet the problem of civil rights violence." H. R. Rep. No. 473, p. 3. The bulk of the Report simply adopted by reference certain language that had appeared in the "Additional Views" of Chairman Celler of the House Committee on the Judiciary that had been appended to the House Report of the Civil Rights Act of 1966, H. R. Rep. No. 1678, 89th Cong., 2d Sess., pt. 2 (1966). The language quoted in the text is taken from those views of Chairman Celler as expressed in the earlier House Report and

The Senate Report likewise explained Title I as a measure "to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights." S. Rep. No. 721, 90th Cong., 1st Sess., 3 (1967). This concern with racially motivated acts of violence pervaded the report, see *id.*, at 4, 5, 6, 7, 8, and 9. In the debate on the floor of the Senate, frequent references to the bill's being directed at crimes of racial violence were made,[15] the following being particularly relevant here:

> "This new law would provide that when a law enforcement officer totally abandons his duty in order to violently intimidate individuals seeking

as adopted by the House in the subsequent Congress. Chairman Celler made abundantly clear in those views that the bill that became § 245 "is designed to meet the problem of present-day racial violence . . . ," H. R. Rep. No. 473, *supra*, at 5, and he reiterated this view of the bill when it arrived on the House floor for consideration after finally passing the Senate in 1967:

"[The Senate version of the bill] reenacts the bill that we passed, giving protection to civil rights workers who might be endeavoring to express their beliefs in various parts of the country, and the provisions therein would protect them against violence." 114 Cong. Rec. 6490 (1968). See *id.*, at 9559.

[15] See *id.*, at 318–320, 333, 335, 399, 535, 538, 913, 928, 1391, 1392. A Department of Justice witness testifying before a Senate subcommittee in support of Title I, stated that it "would afford the Federal Government an effective means of deterring and punishing forcible interference with the exercise of Federal rights," and that "[t]he mere fact that a policeman who is performing his duty in good faith uses force does not bring him under the act at all." Hearings on the Proposed Civil Rights Act of 1967, before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 82, 355 (1967). Those hearings, like the Senate Report and the floor debate in the Senate, are replete with numerous references to the use of violence to deter the exercise of federal rights. See *id.*, at 61, 81, 210–212, 222, 312, 322, 325, 349.

lawfully to exercise certain enumerated Federal rights, he will be punished like any other citizen.

". . . So long as it appears that an officer reasonably believed he was doing his duty, that is, that the arrest took place because of a perceived violation of a then-valid law, no case of knowing interference with civil rights could be made against him." 114 Cong. Rec. 2268 (1968).

Viewed in this context, it seems quite evident that a state prosecution, proceeding as it does in a court of law, cannot be characterized as an application of "force or threat of force" within the meaning of § 245. That section furnishes federal protection against violence in certain circumstances. But whatever "rights" it may confer, none of them is denied by a state criminal prosecution for conspiracy or boycott. Here, as in *Peacock*, there is no "federal statutory right that no State should even attempt to prosecute them for their conduct." 384 U. S., at 826.[16]

## IV

We think further observations are in order. We stated in *City of Greenwood* v. *Peacock:*

"[I]f changes are to be made in the long-settled interpretation of the provisions of this century-old removal statute, it is for Congress and not for this Court to make them. Fully aware of the established meaning the removal statute had been given by a consistent series of decisions in this Court, Congress

---

[16] The three Courts of Appeals faced with the issue now before us are in accord with our decision. *New York* v. *Horelick*, 424 F. 2d 697, 703 (CA2), cert. denied, 398 U. S. 939 (1970); *Hill* v. *Pennsylvania*, 439 F. 2d 1016, 1022 (CA3), cert. denied, 404 U. S. 985 (1971) (alternative holding); *Williams* v. *Tri-County Community Center*, 452 F. 2d 221, 223 (CA5 1971) (*quo warranto* proceeding).

in 1964 declined to act on proposals to amend the law. All that Congress did was to make remand orders appealable, and thus invite a contemporary judicial consideration of the meaning of the unchanged provisions of 28 U. S. C. § 1443." *Id.*, at 834–835.

When we decided that case, there had been introduced in the Congress no fewer than 12 bills which, if enacted, would have enlarged in one way or another the right of removal in civil rights cases. *Id.*, at 833 n. 33. None of those bills was reported from the cognizant committee of Congress; none has been reported in the intervening years; and the parties have informed us of no comparable bill under active consideration in the present Congress. The absence of any evidence or legislative history indicating that Congress intended to accomplish in § 245 what it has failed or refused to do directly through amendment to § 1443 necessitates our considered rejection of the right of removal in this case. Also, as we noted in *Peacock*, there are varied avenues of relief open to these defendants for vindication of any of their federal rights that may have been or will be violated, 384 U. S., at 828–830; and, indeed, it appears from the record in this case that at least one such avenue was pursued early on by them and continues to be pursued.[17]

*Affirmed.*

---

[17] Brief for Petitioners 16 n. 9:

"Simultaneously [with the filing of the removal petition *sub judice*], the petitioners also filed a complaint pursuant to 42 U. S. C. § 1983 seeking injunctive relief against the arrests and prosecutions in a companion action, *Concerned Citizens of Vicksburg* v. *Sills*, Civ. No. 72W–18 (N) (SD Miss. filed May 24, 1972), but the District Court denied temporary injunctive relief which would have held the prosecutions in status quo pending a final hearing on the merits (Order of May 26, 1972). A final hearing in that action has not yet been held, and is not part of this appeal."

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

I believe the dissenters in *City of Greenwood* v. *Peacock*, 384 U. S. 808 (1966), correctly construed the civil rights removal statute, 28 U. S. C. § 1443. See *New York* v. *Galamison*, 342 F. 2d 255, 275 (CA2) (Marshall, J., dissenting), cert. denied, 380 U. S. 977 (1965). On that broader view of the statute, removal would plainly be proper here, and if the Federal District Court determined that the state proceedings were being used to deny federally protected rights, it would be required to dismiss the prosecution. See *City of Greenwood* v. *Peacock, supra*, at 840–848 (DOUGLAS, J., dissenting). Even under *Peacock* and its companion case, *Georgia* v. *Rachel*, 384 U. S. 780 (1966), however, I think that removal should have been available on the particular facts of this case.

As the Court today observes, *Rachel* and *Peacock* imposed sharp limitations on the scope of the removal statute. The statute was held to permit removal only in the rare case in which (1) the federal right at issue stemmed from a law providing expressly for equal civil rights; (2) the conduct with which the removal petitioners were charged was arguably protected by the federal law in question; and (3) the federal law granted the further right not only to engage in the conduct in question, but to be free from arrest and prosecution by state officials for that conduct. Focusing on the third requirement, the Court today holds that Title I of the 1968 Civil Rights Act, 18 U. S. C. § 245, does not provide a right to be free from arrest and prosecution for engaging in specific federally protected conduct. In my

view, the three requirements from *Peacock* were satisfied to the extent necessary to call for a full hearing on the removal petition, and I would therefore vacate the judgment of the Court of Appeals and remand for further proceedings.[1]

I

The Court of Appeals based its ruling on the first of the three requirements, holding that § 245 was not a "law providing for . . . equal civil rights." The court reasoned that the statute failed to meet this requirement because it did not "provide" any substantive rights but merely supplied a criminal sanction for the violation of rights that had been elsewhere created. This misses the point.[2]

Even if § 245 is regarded solely as creating criminal penalties for interference with previously established civil rights, it certainly "provid[es] for" those rights by facilitating their exercise. Congress plainly intended § 245 in part to render certain rights meaningful, even though the rights themselves had in some instances been

---

[1] Although the District Court initially held a hearing on the removal petition and made various factual findings adverse to the petitioners, the Court of Appeals disposed of the case without reviewing the findings of the District Court. I would therefore remand the case to the Court of Appeals to review the findings relevant to the availability of removal and to order further proceedings if necessary.

[2] The Court of Appeals acknowledged that § 245 met the requirement that the statute under which removal is claimed be a law dealing with "specific civil rights stated in terms of racial equality," *Georgia* v. *Rachel*, 384 U. S. 780, 792 (1966). See 488 F. 2d 284, 286 (CA5 1974). The statute was plainly addressed to problems associated with the exercise and advocacy of minority rights. Like the 1964 Civil Rights Act, and unlike the more general constitutional and statutory provisions that were rejected as bases for removal in *Rachel* and *Peacock*, § 245 (b) (2) refers throughout to conduct premised on racial discrimination.

created in prior legislation. See S. Rep. No. 721, 90th Cong., 1st Sess., 4–6 (1967); H. R. Rep. No. 473, 90th Cong., 1st Sess., 5–7 (1967). If Congress had provided private legal or equitable remedies for the vindication of pre-existing rights, such a statute would certainly be deemed one "providing for" equal civil rights. The fact that Congress has invoked the criminal sanction to protect and enforce those rights rather than relying on private remedies should make no difference.

In any event, § 245 does more than enforce pre-existing rights: in several respects it creates rights that had no previous statutory recognition. First, the statute protects not only those participating in the exercise of equal civil rights, but also those "encouraging other persons to participate" and those "participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate," § 245 (b)(5). See S. Rep. No. 721, *supra,* at 4. Second, because it is based on § 5 of the Fourteenth Amendment rather than the Commerce Clause, § 245 goes beyond the specific protections of prior civil rights laws in various particulars. As the House Report noted:

> "[T]he scope of the activities described in section [245 (b)] is not limited to the scope of the 'rights' created by other Federal laws outlawing discrimination with respect to those activities. Accordingly, in appropriate cases, . . . the bill would reach forcible interference with employment, regardless of the size and regardless of the public or private character of the employer; with service in all of the described types of places of public accommodation, whether or not they happen to fall within the scope of the 1964 Civil Rights Act; and with common carrier transportation whether interstate or intrastate." H. R. Rep. No. 473, *supra,* at 5.

Finally, the statute goes beyond protecting against racially motivated misconduct by state officials and those acting in concert with them. It reaches racially motivated conduct by private individuals as well, thus extending both a right against, and a remedy for, certain private misconduct. The inclusion of private individuals within the reach of § 245 was a topic of intense dispute during the congressional debates over the statute. Both the advocates and opponents of the statute recognized that § 245 would criminalize a whole new sphere of conduct and thus significantly expand the scope of federal statutory protection for civil rights. See S. Rep. No. 721, *supra,* at 7–8, 21–26; 113 Cong. Rec. 22763–22764 (1967); 114 Cong. Rec. 319, 389–391, 539–544 (1968). In view of the statute's broad remedial purposes and effects, only on the most grudging reading can it be said not to "provid[e] for equal civil rights."

## II

Although neither the Court of Appeals nor this Court has discussed the second requirement for § 1443 removal, I believe that under *Rachel* and *Peacock* a sufficient showing has been made to require further proceedings below. The Court in *Peacock* established that where the state criminal charge includes allegations of conduct clearly unprotected by federal law, removal is not available. In that case, the state charges included obstruction of the streets, assault, and interference with a police officer—all forms of conduct not even arguably protected under federal law. 384 U. S., at 826–827.[3]

---

[3] The Court rejected the argument made in dissent that it was the allegations in the removal petition that should be looked to in determining whether the conduct was arguably protected by federal law, not the charges filed in the state proceeding. As has been suggested elsewhere, relying on the charges to determine whether the

In *Rachel,* by contrast, the Court observed that the defendants had been charged only with violating the state criminal trespass statute, which required that a person leave a place of business when requested to do so by the owner. The defendants alleged in their removal petitions that they had remained on the premises of the privately owned restaurants where they were arrested in the course of seeking service to which they were entitled by the 1964 Civil Rights Act. Thus none of the conduct that the defendants were allegedly engaged in fell plainly outside the protection of federal law, as was the case in *Peacock.* Accordingly, the District Court was instructed to hold a hearing to determine whether the defendants were ordered to leave the restaurant facilities solely for racial reasons, and whether the conduct was in fact within the protection of federal law—in that case by determining whether the restaurants in question were within the coverage of the Civil Rights Act. 384 U. S., at 805 and n. 31.

On this point, the instant case is controlled by *Rachel* rather than *Peacock.* The arrest affidavits charged merely that the petitioners had conspired to promote a boycott of merchants and businessmen and that they had engaged in and promoted acts "injurious to trade or commerce among the public." App. 3–17. In their removal papers, the petitioners alleged that the conduct underlying their arrests on these charges was wholly within

conduct is protected would immunize from removal any case in which the state charges included allegations of conduct plainly outside the scope of federal protection. See H. Hart & H. Wechsler, The Federal Courts and the Federal System 1228 (2d ed. 1973); *Perkins* v. *Mississippi,* 455 F. 2d 7, 11, 31–33 (CA5 1972) (Brown, C. J., dissenting); Comment, Civil Rights Removal after *Rachel* and *Peacock:* A Limited Federal Remedy, 121 U. Pa. L. Rev. 351, 368 (1972).

the protection of federal law.[4]   There is nothing in the arrest affidavits or the statute under which the petitioners were charged that rebuts this claim.   The line between *Rachel* and *Peacock* is that between "prosecutions in which the conduct necessary to constitute the state offense is specifically protected by a federal equal rights statute under the circumstances alleged by the petitioner, and prosecutions where the only grounds for removal are that the charge is false and motivated by a desire to discourage the petitioner from exercising or to penalize him for having exercised a federal right." *New York* v. *Davis,* 411 F. 2d 750, 754 (CA2), cert. denied, 396 U. S. 856 (1969).   Like *Rachel,* this case falls into the former category.   Accordingly, the courts below should determine whether the petitioners' conduct was in fact protected.   If it was, the prosecutions should be dismissed.[5]

---

[4] Specifically, the petitioners alleged that in order to protest various forms of private and public racial discrimination they "began to peacefully and lawfully picket the business establishment of [offending] merchants in Vicksburg, Mississippi, and began to urge the citizens of Vicksburg to boycott these business establishments. All of this picketing by the petitioners and other members of their class was done in a lawful and peaceful manner and without infringing upon the rights of any other citizen of Vicksburg . . . ."   App. 22.

[5] The respondents contend in their brief that the petitioners were arrested for acts ranging from engaging in a secondary boycott to physically interfering with and intimidating a customer who was trading with a white merchant.   The petitioners respond that both the arrest affidavits and the testimony at the remand hearing before the District Court were to the effect that they were all arrested pursuant to the general state conspiracy statute, and specifically for entering into "a conspiracy harmful to trade or commerce." *Id.,* at 30.   Since the remand order was the only judgment before the Court of Appeals, it is not clear what effect subsequent actions taken by state officials would have on the removal suit on appeal.   In any event, because of the continuing dispute over what state statute was used as the basis for the charges in state court, and correspondingly, what conduct was alleged, the question whether the conduct

## III

Finally, the *Rachel-Peacock* test requires that the federal law invoked by the petitioners must do more than merely provide a defense to conviction: it must immunize them from arrest and prosecution for the conduct in question. In *Rachel,* the Court held that this test was met, since § 203 of the 1964 Civil Rights Act provided: "No person shall . . . (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202." 42 U. S. C. § 2000a–2 (c). The rights protected by § 201 included the right to "full and equal enjoyment of the ... facilities . . . of any place of public accommodation . . . without discrimination . . . on the ground of race." 42 U. S. C. § 2000a (a). Viewing this language in light of a subsequent construction in *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 311 (1964), the Court in *Rachel* concluded that if the facts in the removal petition were found to be true, the defendants would not only be immune from conviction under the Georgia trespass statute, but they would also have a right under the Civil Rights Act of 1964 "not even to be brought to trial on these charges in the Georgia courts." 384 U. S., at 794.

The Court today distinguishes the language of 18 U. S. C. § 245 from that of § 203 (c) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–2 (c), holding that the former does not grant the same immunity from prosecution that was implied in the latter. To me, the language of the two statutes is not sufficiently different to support such a distinction. While the statute in *Rachel* provided that no person should "punish or attempt to punish" a person engaged in conduct protected under the Act, the statute at issue here provides sanc-

---

was protected under federal law is one that should be left to the courts below to determine on remand.

tions against anyone who, "whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with" any person who is engaged in protected civil rights activity or is "lawfully aiding or encouraging other persons to participate" in various protected activities. The use of force or the threat of force to intimidate or interfere with persons engaged in protected activity fairly describes an "attempt to punish" the same persons, and it would seem plainly to include pretextual arrests such as are alleged to have occurred in this case.[6]

Besides the difference in language between § 203 (c) and § 245, the Court points to two other factors that it contends provide a further basis for denying removal here. I do not find either to be dispositive.

First, the Court relies on § 245 (a)(1), in which Congress emphasized that § 245 was not intended to prevent

---

[6] The Court notes "the similarity between the language of § 1971 (b) . . . and the comparable language of § 245 (b)," *ante,* at 221 n. 10. The statutes do, indeed, have similar language, but the conduct protected under § 1971 (b) is *voting,* and there was no allegation in *Peacock* that the defendants were engaged in voting. It was unnecessary for the Court to determine whether § 1971 (b), or a statute with similar prohibitory language, would provide a means for removal because (1) the conduct with which the defendants were charged was not protected under *any* federal law; and (2) their conduct, as alleged in their own removal petition, was not within the scope of § 1971 (b).

Another statute, 42 U. S. C. § 1973i (b), which was enacted after the removal in *Peacock,* protected those urging others to exercise their rights to vote, and thus would have reached the conduct in which the *Peacock* defendants claimed to have been engaged. See *Whatley* v. *City of Vidalia,* 399 F. 2d 521 (CA5 1968). Even under that statute, however, removal would not have been available in *Peacock* because the conduct with which the defendants were charged in the state-court proceeding was unprotected by that or any other federal law.

"any State . . . from exercising jurisdiction over any offense over which it would have jurisdiction in the absence of this section . . . ." The Court argues that this "nonpreemption" provision indicates that § 245 "appears to disavow any intent to interrupt . . . state prosecutions [for offenses such as boycotting and conspiracy]." *Ante,* at 224. I cannot agree that § 245 (a)(1) means to do that much. The legislative history of this subsection indicates that it was intended to avoid the risk that § 245 would be read to bar or interfere with state prosecutions of those who violated § 245 as well as parallel state laws. The fear was that § 245, because of its potential breadth, might appear to give pre-emptive authority to federal law officers in prosecuting a broad spectrum of offenses that were traditionally subject to local criminal jurisdiction.[7] There is no indication in the legislative history

---

[7] Section 245 (a)(1) had its origin in an amendment offered to the House bill by Representative Whitener. In his words, the amendment was intended to ensure:

"[N]othing contained in this act shall indicate an intent on the part of Congress to occupy the field in which any provision of the act operates to the exclusion of State laws on the same subject matter, nor shall any provision of this act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this act or any provision thereof. . . . Without the amendment, there would be an unwarranted deprivation of criminal jurisdiction now exercised by the several States in most of the fields of criminal law touched by this bill." 113 Cong. Rec. 22745 (1967).

See also *id.,* at 22683 (Rep. Whitener).

In the Senate, the final language of § 245 (a)(1) was adopted as part of Senator Dirksen's amendment to the bill. The explanation of the provision given to the Senate was as follows:

"Section (a) of the bill expresses the intent of Congress not to supersede state and local law enforcement except where required by the public interest in order to obtain substantial justice. In all cases state and local law would continue to apply, and would not be preempted by federal law. However, in those situations when

that § 245 (a)(1) was intended to defeat removal of state prosecutions by those protected under the Act, nor is there any suggestion that it was meant to reduce the protection for the beneficiaries of § 245 in any other way.

Second, the Court relies heavily on the main purpose of § 245: to penalize violent interference with the exercise of specific rights. Certainly, violent interference with the exercise of civil rights was a primary target of the statute. But curbing private violence was not the drafters' sole aim. The Act was intended to reach law enforcement officers as well as private citizens, and the process of arrest and prosecution in state courts is precisely the means by which state officials, acting under color of state law, can most plausibly exert force or the threat of force to interfere with federally protected rights. See *Perkins* v. *Mississippi*, 455 F. 2d 7, 11, 39–41 (CA5 1972) (Brown, C. J., dissenting).

The Court is correct, of course, in noting that Congress did not expressly indicate that § 245 should be available as a means of removing prosecutions to federal courts. But the Court in *Rachel* did not require any showing that Congress had specifically intended the statute in issue to be used as a vehicle for removal. All that was necessary was that the statute protect against the institution of criminal actions against those engaged in protected federal rights, and in my view that standard is met here.[8]

---

state and local law enforcement is unable or unwilling to prosecute effectively, federal prosecution may be undertaken. To assure that decisions relating to exercise of this dual jurisdiction are carefully made, the bill requires advance certification of prosecutorial authority by the Attorney General or the Deputy Attorney General." 114 Cong. Rec. 4907 (1968).

[8] In its analysis, the Court relies in part on a statement by Senator Kennedy to the effect that a state law enforcement officer reasonably believing that he is doing his duty, would not violate § 245, which requires at least knowing interference with civil rights. The

## IV

If the facts of this case are as alleged in the removal petition, then the protest effort of the petitioners and their group, although well within the protection of federal law, has been muffled, if not altogether stilled, by discriminatory and cynical misuse of the state criminal process. The Court makes reference to the possibility of federal injunctive relief, which would be available in this case if the petitioners can show that the arrests and prosecutions were instituted in bad faith or for the purpose of harassment. See *Dombrowski* v. *Pfister,* 380 U. S. 479, 482, 490 (1965); *Younger* v. *Harris,* 401 U. S. 37, 47–50 (1971). I only hope that the recent instances in which this Court has emphasized the values of comity and federalism in restricting the issuance of federal injunctions against state criminal and quasi-criminal proceedings will not mislead the district courts into forgetting that at times these values must give way to the need to protect federal rights from being irremediably trampled. The possibility that the petitioners might be vindicated in state-court criminal actions or through subsequent habeas corpus relief will do little to restore what has been lost: the right to engage in legitimate, if unpopular, protest without being subjected to the inconvenience, the expense, and the ignominy of arrest and prosecution. If the federal courts abandon persons like the petitioners in this case without a fair hearing on the merits of their claims, then in my view comity will have been bought at too great a cost.

I respectfully dissent.

---

interference alleged in the removal petition, however, is intentional interference, which would fall within the literal terms of the statute.