**UNITED STATES of America, Appellee,**

v.

**Domingo PIMENTAL, Defendant–Appellant.**

**No. 1567, Docket 91–1744.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1992.

Decided Oct. 23, 1992.

Christine E. Yaris, New York City (Jorge DeJ. Guttlein, of counsel), for defendant-appellant Domingo Pimental.

David N. Kelley, Asst. U.S. Atty., Southern District of New York, New York City (Otto G. Obermaier, U.S. Atty., Elizabeth Glazer, Asst. U.S. Atty., of counsel), for appellee, U.S.

Before: PRATT, FRIEDMAN,* and ALTIMARI, Circuit Judges.

* Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

FRIEDMAN, Circuit Judge:

In this appeal from convictions for interfering with the federally protected rights of an informant by killing him and for bail-jumping, the appellant contends that the statute under which he was convicted for interference with federally protected rights, 18 U.S.C. § 245(b)(1)(B) (1988), requires a racial or discriminatory motive which was neither alleged nor proved, and that the district court erroneously instructed the jury on both the § 245 and bail-jumping counts. We reject these contentions and affirm the convictions.

## I

After a jury trial in the United States District Court for the Southern District of New York, the appellant Pimental was convicted on three counts: (1) interfering with the federally protected activities of a government informant by killing him, in violation of 18 U.S.C. § 245(b)(1)(B); (2) retaliating against the same informant by killing him, in violation of 18 U.S.C. § 1513(a)(2) (1988); and (3) jumping bail, in violation of 18 U.S.C. § 3146(a) (1988). He was sentenced to life imprisonment on count one, a concurrent term of ten years imprisonment on count two, and fifteen months' imprisonment on count three to run consecutively to the other sentences, and the mandatory $150 assessment was imposed.

The evidence supporting the jury verdict, the sufficiency of which is not challenged, shows that after Pimental pleaded guilty to federal counterfeiting charges and was released on bail, he killed Juan Guerrero, an informant who had provided critical evidence against him. Prior to the killing, Pimental informed a companion that Guerrero "was a snitch," and that "he would kill him if he ever found him." On the day after he pleaded guilty, Pimental found Guerrero in the South Bronx and beat him to death with a baseball bat, crushing his skull and breaking virtually every bone in his face.

Pimental later failed to appear for sentencing on his counterfeiting guilty plea, as the conditions of his release required.

## II

Pimental's principal contention is that he was improperly convicted under 18 U.S.C. § 245(b)(1)(B) because that statute requires a racial or discriminatory motive that was neither alleged nor proved. Pimental contends that because he is, and his victim Guerrero was, Hispanic, count one did not charge and the government did not prove a violation of § 245(b)(1) and count one should have been dismissed. Prior to trial, Pimental moved to dismiss count one on that ground. The district court denied the motion, ruling that § 245(b)(1) is not limited to conduct racially or discriminatorily motivated.

Section 245 of Title 18, entitled "Federally protected activities," proscribes the deprivation, by injury, interference or intimidation, of various enumerated rights. Subsection (b)(1) provides, in pertinent part:

(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(1) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—

The statute lists five groups of protected federal rights, including voting (A), applying for or enjoying federal employment (C), and serving as a federal grand or petit juror (D). Subparagraph (b)(1)(B), under which Pimental was convicted, covers

(B) participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States....

A. Nothing in this language even suggests, let alone requires, that there must be a discriminatory motive for interference with the victim's federal rights. The provision covers "[w]hoever" willfully and forcefully injures "any person" because that person has been participating in any federally protected or administered activity— here Guerrero's participation as an informant in a counterfeiting investigation. There is no reference to any discriminatory

motive in this provision. The focus of subsection (b)(1) is on conduct and not, like subsection (b)(2), discussed below, upon motive.

When Congress intended to require such a discriminatory motive, it said so clearly and unequivocally. The next subsection of the statute, § 245(b)(2), prohibits interference with or intimidation of "any person because of his race, color, religion or national origin and because he is or has been" exercising any of various enumerated rights including enrolling in a public school, serving as a state court juror, traveling or using any facility in interstate commerce, or participating in state-administered programs. The lack of a similar explicit discrimination requirement in subsection (b)(1), which Congress presumably would have included had it intended subsection (b)(1) so to require, is strong evidence that the latter section does not contain a discriminatory motive requirement. *Cf. Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983) (Congress presumed to act intentionally when it includes particular language in one section of a statute but omits it from another).

Pimental contends, however, that in another subsection of § 245—subsection (b)(4)—Congress manifested its intention to require a discriminatory motive under subsection (b)(1). That subsection proscribes interference with or intimidation of

any person because he is or has been ... participating, without discrimination on account of race, color, religion or national origin, ... or affording another person or class of persons opportunity or protection to so participate

in any of the benefits or activities specified in subsections (b)(1) and (b)(2). 18 U.S.C. § 245(b)(4).

Pimental argues that if a discriminatory motive is not required under subsection (b)(1), there was no need or occasion for Congress to include in subsection (b)(4) the "without discrimination" clause. According to Pimental, his interpretation is necessary to give meaning to § 245(b)(4), since unless subsections (b)(1) and (b)(4) are read

together this way, subsection (b)(4) would be "wholly superfluous" because everything it covers would already be covered in subsection (b)(1).

The argument has a fatal flaw. Subsection (b)(4) is broader than subsection (b)(1) and covers conduct that subsection (b)(1) does not reach.

Section 245(b) contains five subsections. Subsection (3) is irrelevant to the issue here; it prohibits injuring or threatening someone engaged in interstate commerce during a riot. Subsections (1) and (2) protect people who directly participate in or enjoy the benefits of various federal and state programs.

Subsection (4) more broadly also prohibits intimidating any person from "affording another person or class of persons opportunity or protection to so participate" in the benefits and activities specified in subsections (1) and (2). Similarly, subsection (5) bars intimidation of any citizen in order to "intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in" subparagraphs (1) and (2).

Thus, subsections (4) and (5) protect not only the direct participants in and beneficiaries of the activities specified in subsections (1) and (2), but also protect third persons whose involvement takes the form of aiding the activities or assisting others to participate when, in such indirect participation, they act according to federal law and policy, i.e., "without discrimination on account of race, color, religion or national origin."

In other words, Congress included the "without discrimination language" in subsections (4) and (5) to protect those people who opposed or defied members of the community who discriminated in the administration of state or federal activities. Examples would be people who transport voters to the polls (subsection (b)(1)(A)) or escort children to public schools that oppose admitting them because of their race (subsection (b)(2)(A)).

Thus, contrary to Pimental's contention, subsection (4) would not be "wholly superfluous" unless subsection (1) were interpreted to include a discriminatory motive requirement. Although there may be some overlap between subsections (1) and (4), such overlap does not justify departing from the unambiguous language of subsection (1) by reading into it a discriminatory motive limitation that Congress did not include.

B. 1. Pimental also cites the legislative history of § 245. He relies upon statements in the House and Senate reports on an earlier version of the legislation that Congress intended "to meet the problem of present-day racial violence," H.R.Rep. No. 473, 90th Cong., 1st Sess. 5 (1967), and "to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights." S.Rep. No. 721, 90th Cong., 1st Sess. 3 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837, 1838. The complete legislative history of the provision, however, supports our interpretation of the statute, not Pimental's.

The initial version of § 245, on which the House and Senate reported, proscribed interference with various rights only if the interference, intimidation, or injury was motivated by the victim's race, color, religion or national origin. That version provided, in pertinent part:

§ 245. Interference with civil rights.
Whoever, whether or not acting under color of law, by force or threat of force—
(a) knowingly injures, intimidates, or interferes with, or attempts to injure, intimidate, or interfere with any person because of his race, color, religion, or national origin and because he is or has been engaging or seeking to engage, lawfully, in [protected activity such as voting, enrolling in public schools, etc. shall be guilty of a crime.]

H.R. 2516, 90th Cong., 1st Sess. (1967).

This version produced what this court has described as "much acrimonious debate," *United States v. Pacelli,* 491 F.2d 1108, 1115 n. 4 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974),

in which the minority in the Senate, comprised in large part of Southern senators, expressed concern that this version would primarily be enforced against Southern states, and urged the Senate to adopt its version of the bill, "which would apply the guarantees of law to all citizens, regardless of race, creed, color, or national origin." S.Rep. No. 721, 90th Cong., 2d Sess. 13 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837, 1846.

Several months later, Congress adopted the current version, which included for the first time subsections (b)(1) and (b)(4). Pub.L. 90–284, title I, § 101(a), 82 Stat. 73 (1968). Subparagraph (b)(1) made no reference to a discriminatory motive, and subparagraph (b)(4) made it a crime to intimidate those who participate in specified conduct, "without discrimination on account of race."

Although there is no legislative history explaining the reason for the changes or the meaning and intended application of subsections (b)(1) and (b)(4), it is fair to conclude that they were intended to meet the Senate minority's concern that § 245 protect against interference with "all citizens'" federal rights, and not just discriminatory interference, as the earlier version did. Congress thus added subsection (b)(1) to cover actions against persons based upon their exercise of federally protected rights, whether or not those actions had a discriminatory motive and included the same standard in the protection it provided in subsection (b)(4).

2. Pimental also cites *Johnson v. Mississippi,* 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975), *Pacelli,* 491 F.2d 1108, and *United States v. Bledsoe,* 728 F.2d 1094 (8th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984), to support his contention that § 245(b)(1) requires a discriminatory motive. The issue in *Johnson* was whether § 245 provided a basis for removal of state prosecutions to federal court. Although the Supreme Court quoted from the House and Senate reports on the earlier version of § 245 and highlighted the concern in those reports with racially motivated acts of violence,

subsections (b)(1) and (b)(4) were not involved in that case and, as we have noted, the House and Senate reports dealt with legislation that did not contain those provisions.

Pimental relies on this court's decision in *Pacelli* for the proposition that § 245 deals "with racial violence only." *See* 491 F.2d at 1115. Although the court in *Pacelli* stated that the "principal purpose of the [Senate Judiciary] Committee" was "to draft a law effectively dealing with racial violence only," *id.*, the court also pointed out that although

> [w]hen it first emerged from the Senate Committee on the Judiciary, [§ 245] applied only to deprivations of the listed federal rights which were racially motivated[,] ... [i]t was subsequently amended after much acrimonious debate to prohibit deprivations of some federal rights which were nonracially as well as racially motivated.

491 F.2d at 1115 n. 4.

The latter statement in *Pacelli* accords with our analysis and interpretation of subsection (b)(1) in this opinion.

Finally, Pimental argues that *Bledsoe* stands for the proposition that Congress was exercising only its powers under the Thirteenth and Fourteenth Amendments in enacting § 245, and that discriminatory motive therefore must be shown. In that case, however, the court was considering the validity of only § 245(b)(2), which prohibits racially motivated interference with federal rights, and did not discuss subsections (b)(1) or (b)(4). 728 F.2d at 1096.

C. Pimental also urges us to apply the "rule of lenity" to construe subsection (b)(1) in his favor as requiring a discriminatory motive. We see no ambiguity in that subsection, however, that would call for applying the rule of lenity. As we have shown, subsection (b)(1) does not include any requirement of discriminatory motive, either explicitly or by implication. We cannot conclude that that provision "is so ambiguous and uncertain that [it] should be narrowly construed in his favor." *Huddleston v. United States*, 415 U.S. 814, 830, 94 S.Ct. 1262, 1271, 39 L.Ed.2d 782 (1974).

III

Pimental's remaining contentions that the district court erroneously instructed the jury on both the § 245(b)(1)(B) and bail jumping counts need not detain us long.

A. An essential element for conviction under § 245(b)(1)(B) is the victim's enjoyment of or participation in the protected activity. The district court instructed the jury on this element as follows:

> A person has the right to enjoy the benefits of or participate without interference in the performance of a cooperation agreement which is administered by the United States Courts.

> Similarly, a person has the right to enjoy the benefits of or participate without interference in an informant program supervised by a law enforcement agency of the United States such as the United States Secret Service.

> If you find beyond a reasonable doubt that the defendant willfully injured or interfered with [Guerrero] because he had been providing information in connection with either a cooperation agreement administered by the United States Courts or the confidential informant program of the Secret Service, or both, then the government has established and satisfied this element of Count 1.

In its charge on the bail-jumping count, the district court instructed the jury that

> with regard to the first element, whether the defendant was released pursuant to the statutes governing pretrial release, I instruct you that the defendant was, in fact, so released. Therefore you need not concern yourselves with element one of count three.

> The second element of the crime of bail jumping is whether the defendant was required to appear in court before a judicial officer. That's a legal question for me to decide. I instruct you that under the law the defendant was required to appear before Judge Kimba Wood before this court.... Thus, you don't have to

concern yourselves with the second element of count three.

Pimental did not object to these instructions.

Pimental contends that the district court, through these instructions, usurped the jury's fact-finding function by removing matters from its consideration.

B. Under Federal Rule of Criminal Procedure 30, "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Since Pimental failed to so object, we review the district court's instructions for plain error. Fed.R.Crim.P. 52(b); *United States v. Maniktala,* 934 F.2d 25, 29–30 (2d Cir.1991). We discern no plain error in either of the instructions.

In the § 245 instruction, the court did not, as Pimental contends, "effectively instruct ... the jurors that there was no factual question regarding the sufficiency of the government's proof that Guerrero was engaging in protected activity." To the contrary, the instruction explained the nature of the protected activity, the victim's enjoyment of which was an essential element of the crime, and left to the jury to determine whether the government proved beyond a reasonable doubt that the victim was enjoying a protected right.

With respect to the bail jumping instruction, Pimental stipulated at trial that he had been released on bail and that he failed to appear as required. The district court committed no error in instructing the jury on that charge.

The judgment of the district court is

*affirmed.*