Katherine JACKSON et al., Plaintiffs,

v.

Tom RIDDELL, Jr. et al., Defendants.

No. WC 79–110–K.

United States District Court,
N. D. Mississippi, W. D.

Aug. 31, 1979.

Alvin O. Chambliss, Jr., Oxford, Miss., Alix H. Sanders, Greenwood, Miss., for plaintiffs.

Grady F. Tollison, Jr., and Dan W. Webb, Oxford, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Alfred (Skip) Robinson, Lizzie Bailey Sims, George Caldwell, Katherine Jackson, Catherine Gibson Ross and Ernest Cunningham seek the removal of a civil action instituted in the Chancery Court of Marshall

County by Tom Riddell, Jr., plaintiff, as Chairman of the Democratic Party for the State of Mississippi, allegedly for and on behalf of the State Democratic Party and for and on behalf of the Democratic County Executive Committee of Marshall County. Plaintiff has moved to remand the action to state court, thus raising the issue of removability to this federal district court. While the removal petition alleges several acts of Congress under which removal is sought to be justified, we need be concerned with, and give particular emphasis only to, the removability of the action as a civil rights case under 28 U.S.C. § 1443(1),[1] for alleged infringement of rights conferred by the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., the particular paragraphs of which will hereinafter be dealt with in more detail.

In their removal petition, defendants allege on information and belief that most, if not all, of the thirteen white members of the Marshall County Democratic Executive Committee have acted in conspiracy with plaintiff Riddell, a white, in bringing the Chancery Court action in violation of petitioners' rights arising under a federal law "providing for specific civil rights stated in terms of racial equality." Defendants incorporate into their petition the matters upon which they assert the existence of removal jurisdiction. At the conclusion of a full evidentiary hearing and oral argument on August 18, 1979, the court immediately delivered from the bench informal findings of fact and conclusions of law holding that it was without jurisdiction and sustaining plaintiff's motion to remand.

Because of the importance of the issues presented, the court's oral findings and conclusions are withdrawn, this Memorandum Opinion is issued in lieu thereof, and the court incorporates herein findings of fact and conclusions of law required by Rule 52, F.R.Civ.P., consistent with its bench ruling.

## I. FINDINGS OF FACT

(a) *Background.*

On October 14, 1975, the National Democratic Committee adopted bylaws for the Democratic Party of the United States, providing in ¶ 12 that the Democratic Party shall be open to all who desire to support the party and wish to be known as Democrats, and that participation in the party's affairs shall be open to persons pursuant to standards of nondiscrimination and affirmative action incorporated into the charter of the Democratic Party of the United States. Subparagraph D of the party's bylaws provided that each state shall undertake affirmative action programs reasonably designed to encourage the fullest possible participation of all Democrats in all party affairs at all levels of the state political process to which party officials and public officials are nominated and selected and wherein party platforms and rules are formulated. The National Party also mandated that state affirmative action programs include, but not be limited to, regular programs of voter registration and continuing public relations and educational programs designed to broaden participation by Democrats. Without detailing the various provisions of the National Democratic Party's order that each state must comply with the charter, the national chairperson was authorized to appoint a committee of five persons to oversee state participation and monitor the actions of the Democratic Party of each state. (Ct. Ex. 9).[2]

1. Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

  (1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

2. The adoption of these bylaws had in fact been preceded by Delegate Selection Rules promulgated by the National Democratic Executive Committee on March 1, 1975, applicable to the 1976 Democratic National Convention. These delegate selection rules likewise provided for nondiscrimination in the Democratic Party at all levels, with affirmative action mandated by the Democratic Party in the selection of all delegates and the adoption of affirmative action programs by state Democratic parties. (Ct. Ex. 10, ¶ 17, p. 11 and ¶ 18).

From undisputed evidence, the State Democratic Party in Mississippi was in the throes of a dispute between two factions, each claiming to be the state's only recognized Democratic Party, one known as the Regulars, or the traditionally or predominantly white Democrats, and the other known as the Loyalists, a coalition of blacks and whites. For the state's delegates to be recognized at the National Convention, the state delegation was directed to reach goals mandated by the National Democratic Party. In Mississippi, such action was not long delayed for documents were promulgated for adoption, on February 16, 1975, of an affirmative action plan (Ct. Ex. 5) and a formal mechanism for challenges under the delegate selection plan of elected delegates and alternates to the National Convention. (Ct. Ex. 8). These documents brought into line the opposing Democratic political factions within Mississippi. During the administration of the state's current governor, Cliff Finch, an accord between the two factions was reached and they were, for the first time in many years, able to present a united front as the Democratic Party of Mississippi which was acceptable to the National Democratic Executive Committee.

To provide a better understanding of the controversy at hand, it should be noted that precinct caucuses were held on January 24, 1976, throughout the state. The two state co-chairmen of the Democratic Party, i.e., Aaron E. Henry for the Loyalists and Tom Riddell, Jr., for the Regulars, addressed the subject of county convention procedures in a document dated January 29, 1976, which was sent to party co-chairmen in every county of the state, including Charles Dean and George Caldwell, then co-chairmen of the Marshall County Democratic Executive Committee. (Ct. Ex. 1). This communication, *inter alia,* summarized the duties and obligations of delegates to conduct an election and comply with the mandate to which the state Democratic Party had committed itself, the overriding purpose being to assure full and fair participation by all Democrats. The instructions and materials further stated, in summary form, that should any question, dispute or challenge arise over the procedure or the manner in which the county convention was conducted, efforts should be made to settle the matter locally, but if local efforts proved unavailing, the chairperson of the county executive committee or interested parties should notify one or both of the named persons, Herman Glazier, white, and Esther M. Harrison, black, designated co-chairmen of the State Affirmative Action/Compliance Review Committee (Review Committee), at the specified Jackson address. These instructions further provided that in the event of a dispute of any nature, the co-chairmen of the Review Committee would set a time, place and date for all interested persons to appear before the Review Committee and make information available in written form with supporting papers.

As a part of the national mandate to the state democratic hierarchy, there had to be equal representation as to sex, with proper balance for race as well as age, thus assuring adequate participation of all population elements within the state at all levels of the political process. (Ct. Ex. 9, § 12; Ct. Ex. 5). These preliminary documents of the merged party in Mississippi were formalized on March 14, 1978, by the adoption of a constitution for the Democratic Party for the state. (Ct. Ex. 4).[3]

---

**3.** This document contains the following relevant clauses:

V. *State Executive Committee*

. . . . .

3. The State Executive Committee shall have the power to elect its officers and shall be the final authority on any questions involving the party, its officers, nominees and/or other executive committees. The State Executive Committee, except as otherwise provided, shall have sovereign, original, appellate and supervisory power and jurisdiction of all party matters throughout the state and each county thereof between conventions. It is empowered and authorized to prescribe and enforce rules, regulations and penalties against the violation of party loyalty, including the removing or debarring from party office or party privilege anyone within its jurisdiction including a member of this committee, who violates its rules or its other lawful mandates.

(b) *Facts Relating to the Present Controversy.*

On February 14, 1976, the duly chosen Marshall County Executive Committee, consisting of 30 persons—17 blacks and 13 whites—met. Shortly thereafter, the committee elected as its co-chairmen Arvern Moore, black, and Whitley Cocke, white, and as secretary Ms. Wilma Ford, black.

4. The State Executive Committee may review, on appeal, the decisions of the district, county, and precinct conventions or committees, in all cases concerning the nomination of officers and all matters relating to rules and policies as hereinafter provided.

.    .    .    .    .

VII. *Appeals Council*
1. To insure fairness and prevent injustice in the internal operations of any Mississippi Democratic Party organization there shall be established an Appeals Council of the State Democratic Executive Committee consisting of five members of the State Executive Committee other than administrative committee members to be appointed by the chairperson with the approval of the executive committee, whose members shall serve for four years unless they resign beforehand.
2. The Appeals Council shall have jurisdiction over all matters of party rules and the internal operations of the Democratic Party of the State of Mississippi at all levels, including the election of delegates or the operation of the various executive committees.
3. Any member of the Democratic Party of the State of Mississippi feeling aggrieved by the action, inaction or decision of any official Democratic Party of Mississippi unit or organization may appeal such action or decision to the Appeals Council.
4. No appeal shall lie before the Appeals Council which has not been first presented in writing to the organizational unit against which the complaint is made and there has been reasonable opportunity for said organizational unit to act.
5. All appeals to the Appeals Council shall be in writing setting out the names and addresses of the complaining parties and the name or identification of the unit against which the complaint is made, a clear and concise statement or explanation of the charge or complaint being made and the relief being sought. A copy of the initial complaint made before the unit complained about shall be attached to the appeal. The Appeals Council shall promptly notify in writing the unit complained of that the appeal has been taken and shall attach to such notification a copy of all papers mentioned in this section. The unit complained of shall have the right to answer in writing the charges made against it, and the Appeals Council shall take no action on said complaint until more than ten

On February 23, the committee decided to expand its membership of 30 by the election of six members-at-large to be selected at a meeting to be held March 8.[4] At this latter meeting, Chairman Moore, then presiding, ruled that the six at-large members authorized by the county committee should be selected on the basis of three whites and three blacks, without regard to sex. The

days after the serving of notice of said appeal on the unit complained of. The Appeals Council shall take no action against the unit complained of without first having a hearing unless said unit shall fail to answer in writing within the time aforementioned.
6. The Appeals Council shall be empowered to dismiss the appeal with or without a hearing. All decisions of the Appeals Council for the purpose of investigating or taking evidence on the charges presented shall be rendered only after the giving of reasonable notice to the parties. At least ten days prior to any such hearing the committee shall furnish all parties with a written set of procedural rules for the conduct of the hearing, the failure of which to do so shall render void any and all actions of the Appeals Council until written procedural rules are furnished to all interested parties. The Appeals Council shall not take any action against the unit complained of without a hearing if such unit within ten days of being notified of the appeal shall request a hearing.
7. The Appeals Council may fashion whatever relief it deems appropriate including the removal of any member from office or ordering new elections at any level.
8. The decision of the Appeals Council shall be final unless appealed in writing to the full State Executive Committee within ten days of receipt of the Appeals Council decision. An Appeal to the full State Executive Committee shall be perfected by mailing to the co-chairperson and co-secretaries a copy of the appeal request decision of the Appeals Council and appeal request filed with the Appeals Council and the decision of the Appeals Council shall be held in abeyance until the State Executive Committee renders final judgment on said appeal.

4. By prior state laws, Miss.Code § 3106 (1942); Miss.Code Ann. § 23-1-1 (1972), the County Executive Committee was fixed at 15 members, three to be elected from each supervisor's district. By Chapter 513, 1975 Miss.Laws, effective January 1, 1976, the State Executive Committee was given discretionary authority to double the membership of a county Executive Committee. Miss.Code Ann. § 23-1-4(8). The State Executive Committee had so expanded the membership of the Marshall County Executive Committee.

chairman's ruling was not sustained by the committee as a whole. Instead, a majority of the county committee determined that the six additional at-large members should be elected by majority vote of the committee without regard to race. Thereupon six black citizens who are the defendants in this removal petition were elected to the county Democratic Executive Committee.

On March 27 a complaint was filed by the 13 white members on the county executive committee with the State Executive Committee. The formal complaint was lodged with the Review Committee co-chairmen Herman Glazier and Esther Harrison, state party co-chairmen Henry and Riddell, with copy transmitted to Archie Magee. The letter enclosing the complaint of the minority white members stated: "We are anxiously awaiting a reply and make it to Manny Burch at Holly Springs." (Ct. Ex. 7).

The Review Committee was a group of 30 individuals composed of 15 whites and 15 blacks duly empowered by the State Executive Committee to act on a dispute of this nature. They met on April 10, at the Sunn-Sand Motel at Jackson to consider the challenge presented by Whitley Cocke, J. K. Hurdle, Jr., and Manny Burch on behalf of the white, or minority, members of the county executive committee. At this meeting the Review Committee determined that the added six at-large county executive committee positions were vacant and instructed the original 30 members of the Marshall County Executive Committee to meet and elect six at-large members, composed of three blacks and three whites and three to be men and three women. A copy of the committee action was mailed to Whitley Cocke, Co-chairman, and Wilma Ford, Secretary of the county executive committee.[5] Two days later, this information was made known to the members of the county executive committee, the majority of whose members, being black, were dissatisfied with the ruling of the state Review Committee; the majority voiced its

dissatisfaction, but took no immediate action.

On May 6, Ms. Harrison advised the county executive committee that until the Review Committee had finally ruled on the challenges from the committee, only the 30 original members selected to the executive committee could function and participate as the county executive committee. In her letter, Ms. Harrison stated "you will be informed of the final disposition of the matters in question." (Cts. Ex. 2a).

The matter was held in abeyance until November 20, at which time a written submission signed by 17 blacks, five of whom were the so-called "added" at-large members[6] sought reconsideration of the state Review Committee's decision handed down on April 10. (Ct. Ex. 6). The petitioners assigned various grounds therefor, asserting that the black members of the county committee had not been advised about the action of Whitley Cocke in presenting a challenge to the state Review Committee and "in fact, the letter from Mrs. Esther Harrison, Chair-person of this Committee, informing us of the Committee's actions, constituted our first notice in this regard."

The court finds as a fact that all members of the county executive committee did have direct notice of the initial action taken by the Review Committee. Moreover, it is beyond cavil that all those persons signing the petition sought a hearing before the Review Committee to present their side of the matter. They attached documents which shed direct light upon their knowledge of the status of the situation, including a memorandum of minutes of the Review Committee of April 10, minutes of the county committee meeting of March 8 and a resignation letter dated March 11 from Arvern Moore to Cocke, resigning from the county executive committee. The court further finds as a fact from overwhelming evidence that the formal complaint of the

---

5. At some point in time after the resignation of Arvern Moore, Robinson was elected as co-chairman along with Cocke, his white counterpart.

6. George Caldwell did not sign.

protesters was submitted to the Review Committee on Saturday, November 20, 1976, at a meeting chaired by Ms. Betty Graves. Ms. Graves ordinarily served as secretary of the Review Committee, but on this particular occasion she chaired the meeting along with Dr. Douglas Conner, a black physician, because of the absence of Ms. Harrison and Glazier, the regular chairmen. Present at this meeting were 20 of the 30 members of the Review Committee, constituting a quorum. Appearing on behalf of the protesters were Alfred (Skip) Robinson and Ernest Cunningham, principal spokesmen for the objectors, who maintained that the six additional at-large black members were needed in Marshall County to achieve racial balance on the executive committee, considering the racial mix of the county's population. The opposing faction of whites on the county executive committee were represented; they presented their argument in support of the Review Committee's initial decision. After a full hearing, the Review Committee affirmed its previous ruling of May 6 by finding that six additional black members were not needed to reflect racial balance or to meet any special needs in Marshall County, that the original 30 members were affirmed as the county executive committee and that no additional members could be added without the approval of the Review Committee.[7] Since Ms. Graves was acting as co-chairman with Dr. Conner, Kay B. Cobb served as acting secretary of the meeting; a copy of the minutes were filed with the state Democratic Executive Committee and incorporated in its proceedings. (Ct. Ex. 3). The chairperson did not advise the unsuccessful protesters that they could prosecute an appeal to the State Executive Committee, and no communication was thereafter sent to the protesters that they might appeal the Review Committee's decision.[8] Although defendants offered several witnesses stating that Ms. Harrison told them that the

initial finding was merely a recommendation and not binding upon the county committee, Ms. Harrison's letters as well as the defendants' actions in seeking a review, by way of formal protest, and the committee's action on November 20, 1976, contradict and must control over the oral testimony of defendants' witnesses.

The court finds as a fact that this ruling was made in the actual presence of Robinson and Cunningham as well as Hurdle and Burch, and both opposing factions were then and there advised of the action of the Review Committee. True enough, the protesters were not advised they could appeal to the State Executive Committee or elsewhere. The undisputed fact is, however, that no appeal was taken by the protesters, who are among the petitioning defendants in this removal proceeding, to the State Democratic Executive Committee or to any other group which then or later had supervisory authority over the decisions of the Review Committee. Nevertheless, the defendants continued to meet with the county executive committee and represented themselves to be "at-large members." Discussions about the Review Committee ruling at Jackson occurred intermittently between the two factions on the county executive committee. The upshot was that Robinson and his added fellow at-large members persisted in meeting with the county executive committee. Until the filing of the Chancery Court suit on August 13, 1979, no effort was made by anyone to unseat them from meeting with and holding themselves out as members of the county executive committee.

From the nature of its operation, the county executive committee of a political party on a county level begins performance of its official duties as primary elections or special and general elections draw near. The committee also acts in conjunction with the county election commission which has

7. This action was passed by a vote of 19 for to 1 against.

8. Of course, prior to the formal adoption of the state Democratic constitution in March, 1978, which for the first time established an Appeals

Council, the State Executive Committee as a whole was empowered to review decisions of its Affirmative Action/Compliance Review Committee.

authority over general or special elections as distinguished from Democratic Party primaries. The defendants, notwithstanding their dislodgment by the state Review Committee from membership on the county committee, nevertheless participated in primary and general elections which took place in 1976 for a Supreme Court and U. S. Senate posts and also in the 1978 Congressional and Senatorial primaries and general elections. The court rejects as incredible the testimony offered by defendants that the county committee in its meetings never discussed the presence of those who had been declared by the Review Committee to be illegal members. To the contrary, the matter was frequently discussed, but the black majority on the county committee took no formal action, nor was further protest lodged by the minority, or white members, of the county committee prior to the advent of this present suit.

So it was that matters remained in limbo, and the issue of the defendants' authority to act as at-large members of the county executive committee was not formally raised until shortly before the first primary election of the Democratic Party held on August 7, 1979. On or about that date the true state of affairs in Marshall County was disclosed to the state Democratic headquarters. Thereupon, Riddell, in his capacity as a co-chairman of the state Democratic Party, filed the present action in the Chancery Court of Marshall County against defendants, seeking to enjoin them against continuing to act as county executive committeemen. Although Riddell brought the action in his capacity as Chairman of the state Democratic Party, the undisputed evidence is that neither the full Democratic Executive Committee has met and authorized the bringing of such suit nor did the county executive committee give authority to him to proceed on its behalf.

The court finds as a fact that, prior to election day, there was a confrontation between Ms. Lucy Carpenter, Marshall Coun-

ty Circuit Clerk and official county Registrar, and Ms. Lizzie Sims over whether applications for absentee voting should be released to Ms. Sims, one of the "dislodged" committee members. Ms. Carpenter took the position that no one was authorized to see these applications except herself or her deputies.[9] She later received a telephone call from Robinson demanding that she release the applications for absentee ballots. According to her testimony, Ms. Carpenter invited Robinson to participate in a conference telephone call to the office of the Attorney General of Mississippi to obtain legal advice to guide both of them. Robinson refused to do so, stating to the official, who was herself a candidate for reelection, that he would do "everything possible to beat her" in the upcoming Democratic primary. Since Robinson skipped our evidentiary hearing, the court was deprived of receiving his version of this incident. Instead, Robinson chose to rely on his affidavit which was received in evidence but which was silent on this particular matter. With this development, Ms. Carpenter stated she decided to submit the absentee ballot applications to the Attorney General and made copies available to Ms. Sims.

The court finds from the evidence adduced at our evidentiary hearing that in preparing for the August Democratic first primary, training sessions of poll workers were essential to anyone unversed or without experience in the holding of elections. Such sessions are ordinarily and customarily given by Ms. Carpenter, who has been in office a number of years, and she was competent to provide such training because of her comprehensive knowledge of the duties, responsibilities and obligations of poll workers for holding and conducting fair, open and nondiscriminatory elections. When Ms. Carpenter undertook, as was her custom, to provide for training sessions, Robinson, one of the removing defendants, proceeded to hold a training session on his own, which certain black members on the committee as well as certain black poll workers attended,

9. Miss.Code Ann., § 23-9-407 (Cum.Supp. 1978) states that "[t]he registrar shall be responsible for furnishing an absentee ballot ap- plication form to any elector authorized to receive a ballot."

although it is not exactly clear to us who did attend Robinson's training session. Ms. Carpenter, however, offered a further training session for those who desired to take advantage of this after they had had Robinson's course.

Nevertheless, the fact remains that when the first primary was held, numerous irregularities were committed on the part of poll workers, although the court does not suggest any irregularities of such import occurred as to vitiate the county elections.[10] There were technical violations of legal requirements which clearly manifested unfamiliarity by many poll workers for properly handling election business. Their unfamiliarity was complicated by the fact that the elections in Marshall County involved not only a Democratic primary but included the general election of a new Chancery Judgeship. The irregularities consisted of such things as several boxes having the wrong seals on them; the special election and primary election boxes were confused; one box had a tally sheet not filled out; the primary materials were found in the general election boxes and vice versa, establishing that some in charge of certain boxes had little, if any, knowledge of the fairly complicated, sophisticated procedure for concurrently conducting a political party primary and a general election. It should be noted that there were more black poll workers than had ever handled the boxes on prior occasions. This resulted from a change in the custom which had prevailed in the county under which each member of the county executive committee nominated poll workers, with a committee vote determining the designation of whites and some blacks to manage, or work at, the polls. Prior to the August 1979 primary and general elections, the county committee, by majority vote, had altered that proceeding; instead it named two nominating commitees to bring in the names of poll workers; when these nominations were made, the county committee selected a substantially larger percentage of blacks than ever before as poll workers.

August 7, election day, was fairly eventful in Marshall County. One black candidate, Henry Boyd, Jr., running for the state legislature, testified he was arrested because he insisted on his right to watch the tabulation of the votes. Robinson, too, was arrested, although the reason for his arrest does not appear since Robinson was absent from our hearing. It appears quite clear from Boyd's testimony, which was not rebutted, that white poll officials at this particular Byhalia box told Boyd he would have to leave because of "tradition," and that Boyd, whose white opponent was Ralph Doxey, insisted he had the right to remain. Whereupon, the white official caused Boyd to be arrested and removed from the scene. Moreover, George Williams, a black manager at another box, testified that while undertaking to carry out his official duties, he observed, according to his uncontradicted testimony, that Mayor Coopwood's wife was marking the Mayor's ballot, which caused Williams to challenge the ballot. Mayor Coopwood, who obviously needed no assistance by reason of blindness, physical handicap, or illiteracy, and thus was able to mark his own ballot unassisted, reported this to the chief of police who immediately arrested Williams, according to him, on an old traffic charge. Williams posted bond and returned to the box. Thirty minutes later, candidate Doxey appeared at this same box and signed his name merely as "Ralph." Although Williams let Doxey vote, he did tell the federal observer; for some reason, Doxey then pulled out a knife. For whatever reason, it appears that he and Williams were not on friendly terms. The chief of police again arrived to arrest Williams on a charge of assault. Within 15 or 20 minutes, Williams posted bail and returned to his box. Williams then challenged Doxey's vote because he had refused to sign his full name. It is abundantly clear that Coopwood and Doxey interfered with Williams and made it difficult for him to perform his official duties as a poll manager.

10. This court judicially notices that Federal observers, at the request of county officials, were present at all election boxes in Marshall County on August 7.

As a footnote to the first primary and general election voting, an unprecedented number of blacks were on the ticket as candidates, 15 to 20 of whom were running for county-wide offices. Many of those survived to run in the second or runoff primary to occur August 28.

After August 8, there was a measurable delay in getting the Marshall County primary in state and district races certified to the state Democratic Executive Committee. Although the vote was tabulated immediately after the election, the list to be forwarded to state officials, which was signed by Robinson as "co-chairman," could not be released until it was signed by Cocke, the recognized chairman, who was unavailable until some days later. The tabulated list mailed to state headquarters on Monday, August 13, remained unopened at the time of our evidentiary hearing because of Riddell's standing instructions that no list of tabulated votes be opened in his absence.

It should be noted that Ben Cole, one of the signers of the protest petition and a lawfully elected member of the Marshall County Executive Committee, was a practicing attorney at Holly Springs associated with the North Mississippi Rural Legal Services,[11] and was privy to all of the actions taken by the Review Committee. On cross-examination, Cole acknowledged that Ms. Harrison, by her letters, had stated that the committee had made a final disposition of the matter although his testimony was that Ms. Harrison said that her committee had only vague authority and its decisions were merely recommendations and not enforceable. It, of course, is readily inferable that Cole, as an attorney, had knowledge of the State Democratic Party bylaws and regulations which did expressly provide for an appeal to the state executive committee from any decision made by the Review Committee. The evidence is wholly silent as to the reason for defendants' failure either immediately to prosecute an appeal to the state executive committee or, after the adoption in 1978 of a formal constitution of the State Democratic Party, file an appeal to the Appeals Council provided therein.

The court finds that, despite the feelings of certain black citizens who believe they are being harassed because of race, the action filed by Riddell in state court was not racially motivated, nor was it instituted for racial considerations or for the purpose of harassment or intimidation of the removing defendants in the exercise of their voting rights conferred upon them by federal law. Instead, the court finds as a fact that the real and only reason for institution of the state action was to bring to the Democratic runoff primary and election in Marshall County an assurance that the primary and runoff election[12] would be conducted under the aegis of the regularly elected members of the county executive committee, as recognized by the State Democratic Party. It should be noted that in the interim since their original election in 1976, two blacks have resigned or departed from the committee, and their vacancies have never been filled, thus leaving the county committee presently structured with 15 blacks and 13 whites. We find that the object of the state court action was to settle the rightful authority of persons who were properly elected as county executive committee members, then subject to party discipline and remove those persons acting contrary to the party's rules and regulations.

## II. CONCLUSIONS OF LAW

█ Although the point was not raised in argument, we first address whether plaintiff, in his capacity as a co-chairman of the state Democratic Party, has standing to bring the chancery action since neither the state executive committee as a whole nor the county executive committee authorized the institution of this litigation. Plaintiff relies upon Miss.Code Ann. § 23-1-9 (1972), which, in effect, provides that a person

11. That agency furnished staff counsel for defendants at our removal hearing.

12. There was a runoff in the general election for a newly created Chancery Judgeship in Marshall and adjoining counties.

claiming or representing himself to be a member of a county executive committee, without having been lawfully elected or chosen, shall be enjoined from so doing upon the application by any person, political party or representative of such political party aggrieved thereby.[13] As contained in the editor's note to the 1972 Code, this section is likely unenforceable to the extent that it was amended by Chapter 506, Laws of 1970, and remains in a state of suspended animation until § 5 federal clearance is obtained, in view of the opinion of the three-judge federal district court in *Evers v. State Board of Election Comm.*, 372 F.Supp. 640 (S.D.Miss.1971).[14] Regardless of the 1970 amendment, it is clear that the predecessor statute, Miss.Code § 3107–04 (1942), is authority for Riddell, in his capacity as a co-chairman of the state Democratic Party, to institute an action in the state courts to enjoin any person who may "claim, or represent himself in any manner to be a member of any . . . county executive committee of any political party in this state, . . . without having been lawfully elected or chosen as such in the manner provided by the laws of this state, or by such political party." We hold that Riddell has unquestionable standing to bring the action in his own capacity as a representative or interested person aggrieved by the actions of the petitioning defendants in holding themselves out to be duly elected members of the Marshall County Executive Committee.

In accordance with the teaching of authoritative Supreme Court and Fifth Circuit cases, the court has found it necessary to have a full evidentiary hearing on whether the defendants have a basis of removal to this federal district court under 28 U.S.C. § 1443(1).[15] *See Georgia v. Rachel*, 384 U.S. 780, 805, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966); *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5 Cir. 1968).

In its latest pronouncement, *Johnson v. Mississippi*, 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975), the Supreme Court enunciated an excellent summary of the law in this area, stating that a removal petition under § 1443(1) must pass a two-pronged test:

> First, it must appear that the right allegedly denied the removal petitioner arises under a federal law "providing for specific civil rights stated in terms of racial equality." . . .
>
> Second, it must appear . . . that the removal petitioner is "denied or cannot enforce" the specified federal rights "in the courts of [the] State." This provision normally requires that the "denial be manifest in a formal expression of state law," . . . such as a state legislative or constitutional provision, " 'rather than a denial first made manifest at the trial of the case.' "

421 U.S. at 219, 95 S.Ct. at 1595. The foregoing test was first established in the companion cases of *Georgia v. Rachel, supra*, and *Greenwood v. Peacock*, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), and followed by the Fifth Circuit in *Whatley v. Vidalia, supra*, and *Thompson v. Brown*, 434 F.2d 1092 (5 Cir. 1970).

Counsel for the petitioners have advanced several arguments in support of removal jurisdiction. First, they assert that the decisions of the Review Committee were

---

**13.** No person shall claim, or represent himself in any manner to be a member of any state, district or county executive committee of any political party in this state, or claim to be the national committeeman or national committeewoman or any other officer or representative of such political party without having been lawfully elected or chosen as such in the manner provided by the laws of this state, or by such political party in the manner provided by the laws of this state, including section 23–1–3, Mississippi Code of 1972.

Any person who violates the provisions of this section, in addition to other measures or penalties provided by law, may be enjoined therefrom upon application to the courts by any person or persons or any political party, official or representative of such political party, aggrieved thereby.

**14.** There is no showing that such approval has been sought or granted as to § 23–1–9.

**15.** It is conceded by counsel for petitioning defendants that 28 U.S.C. § 1443(2) applies only to federal officers and is not here apposite.

merely advisory and not binding upon or enforceable by anyone, and that the defendants were so advised by Ms. Harrison; second, that at neither hearing by the Review Committee or at any other time were defendants advised of their right to take an appeal to the state Executive Committee or any other body and that they were accordingly deprived of procedural due process; third, that defendants acted as members of the county executive committee from 1976 until August 1979, and Robinson served as co-chairman to Cocke, certifying the vote to state Democratic headquarters in previous elections without protest by the state Democratic officials or others, with the consequence that raising the issue just after the holding of the first primary, when an unprecedented number of black candidates gained sufficient votes to place them in the runoff primary and a larger number of black poll workers manned the election boxes than. ever before, indicates that the bringing of the chancery action was racially motivated; fourth, that the defendants have the right to serve as county executive committeemen as part of their participation in the political process guaranteed to them specifically in terms of racial equality by the Voting Rights Act of 1965 as well as the fifteenth amendment; fifth, that the mere bringing of the chancery action is an abridgment of defendants' electoral rights, especially since they contend that Chancellor William H. Anderson, the Presiding Judge of the Eighteenth Chancery District before whom the action pends, has expressed, and is infected with, prejudice

against defendants because of their race;[16] sixth, and finally, that because administrative remedies within the party itself have not been exhausted, judicial interference in this dispute is premature and improper.

For his part, plaintiff contends that the first knowledge that the state Democratic headquarters had of the confused state of affairs in Marshall County or that the defendants were persisting in acting as at-large members of the Marshall County Executive Committee came shortly before the August 1979 first primary; that neither plaintiff nor the state Democratic Party had any connection with any acts of discrimination that might have occurred on election day toward black poll workers; and that his actions in bringing the suit were to establish discipline within the party in Marshall County pursuant to the charter and bylaws of the state Democratic Party, the decision of the Review Committee and other documentation relating to the merged Democratic Party within the State of Mississippi as hereinabove detailed.

The Fifth Circuit has held that 42 U.S.C. § 1973i(b), which states that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce . . . any person for urging or aiding any persons to vote or attempt to vote," is to be given an expansive meaning. We so hold, especially in view of the definition of the terms "vote" or "voting" found in 42 U.S.C. § 1973l(c)(1).[17] *Whatley, supra,* at 525. While we find no case precisely in point, we have no difficulty in concluding that the right to serve on the

---

16. With respect to this contention, counsel for defendants at the outset of the hearing stated to the court that they were unable to produce proof that Judge Anderson had expressed prejudicial feelings about the case, and accordingly that contention must fail for lack of proof. The only hint defendants were able to mount was showing a suit had been brought against Ms. Wilma Ford, county committee secretary and sister of Alfred Robinson, by J. K. Hurdle, Jr., white county executive committeeman, for inspection and copying of the Marshall County Executive Committee minutes of which Ms. Ford was the custodian. When this dispute flared up, Hurdle filed an action in chancery court, obtained an injunction, and when Ms. Ford did not respond to the court's order, she

was cited for contempt. Action on the contempt citation was pending and undisposed of at the time of our evidentiary hearing.

17. The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

county executive committee of a political party is one which cannot be denied because of race and that this statute which defendants invoke does present a right arising under a federal law "providing for specific civil rights stated in terms of racial equality." [18]

Conceding that the first prong is met by defendants, the critical issue in this case turns upon credible evidence proving that the second prong of the test—the denial of that right or an inability to enforce it in state court—has been established.[19] Defendants' first contention, *i.e.*, that they were advised by the Review Committee that its actions were merely recommendations and not binding upon or enforceable by anyone, presents only a factual issue which we have disposed of adversely to defendants. Defendants' second contention that the failure of the Review Committee to advise them that they had the right to prosecute an appeal to any higher body is unavailing to meet the second prong of the test, for it is reasonable to believe that persons who are not merely members of the political party but who claim to be officials of that party and who also have access to legal advice were fairly chargeable with notice of the party's rules and regulations. Undeniably, no one prevented defendants from taking a timely appeal. It is beyond question that defendants were aggrieved as a result of the decision of the Review Committee, and although the written decision of the Review Committee does not in so many words state that it is final, nevertheless it is implicitly so because of the elaborate appellate procedures provided in the pertinent documents.[20] We are not impressed with defendants' argument that they did not know appellate rights existed, that they have participated up to this time as county executive committeemen without challenge from anyone on the state or local level, and that the mere passage of time has legitimated their standing on the county executive committee.

With respect to their further contentions, this court, without attempting to make a judgment on the merits of the issue, is persuaded that a political party is entitled to enforce reasonable discipline among its ranks so long as there is no violation of constitutional or federally protected rights. Here, it is evident from the record as a whole that the aims and goals of the National Democratic Party, which were mandated to the state Democratic Party at all levels of the political process, were to insure broad representation of all elements in the community not only as to sex but also as to

18. *See Thompson, supra*, at 1095; *Davis v. State of Ala.*, 399 F.2d 527 (5 Cir. 1968); *Whatley, supra*, at 522–26. We believe this broad interpretation is in conformity with the Supreme Court's admonishment in *Allen v. Board of Elections*, 393 U.S. 544, 565–66, 89 S.Ct. 817, 831–32, 22 L.Ed.2d 1 (1969), that the Voting Rights Act be given "the broadest possible scope:"

   The Voting Rights Act was aimed to the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race. Moreover, compatible with the decisions of this Court, the Act gives a broad interpretation to the right to vote, recognizing that voting includes "all action necessary to make a vote effective."

19. In our view, for example, a classic case fitting the two-prong test would be any state criminal prosecution brought against Henry Boyd, Jr., a candidate for the state legislature, pursuant to the arrest made when he asserted his right to observe the tabulation of the voting. In our opinion, any such criminal prosecution would in itself be a denial of the "right to vote" by federal definition and, hence, removable. *See Thompson, supra*. Similarly, in the case of Williams, if the proof showed that he was arrested as an election manager on charges that were pretextual and had the effect not only of intimidating him but depriving him of the opportunity to act as an election manager, such prosecution would be likewise removable, provided that the proof showed Williams himself was a qualified elector and not subject to the sanctions provided in Miss.Const. Art. 12, § 241.

20. Since the adoption on March 14, 1978, of the formal constitution of the Democratic Party of Mississippi, appeals may not only be lodged with the Appeals Council and from that body to the State Executive Committee as a whole, but from any state action to the National Democratic Party, thus assuring that close examination will be given at the national level to complaints by aggrieved Democrats residing in the State of Mississippi.

race and age. This effort, which obviously sought to bring into the party all segments of the society, was implemented by an affirmative action review committee mechanism to see that this full participation and representation was properly maintained by guarding against majority white exclusion of blacks, no less than it was to guard against majority black exclusion of whites. It is self-evident that even with the six at-large members eliminated from the committee, a black majority remains on the committee with two vacancies remaining unfilled.

We fully agree with defendants' contention that in a matter such as this, involving an internal dispute over interpretation of party policies and regulations, the party itself has primary jurisdiction to resolve such problems in the first instance.

The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court.

3 K. Davis, Administrative Law Treatise § 19.01, at 3 (1958).

It is not the function of this court to pass judgment upon the wisdom or unwisdom of Review Committee decisions or the actions of the state Democratic Party as such matters lie fully within the jurisdiction of the party officials before judicial review by any court, state or federal, would be appropriate. Defendants correctly point out that we have so held in a different factual setting where graduate students of the University of Mississippi abandoned their administrative remedies for challenging failing grades provided by the University and prematurely sought judicial review. *Campbell v. Alpiner*, WC 79–104–K (bench opinion, August 9, 1979). But defendants' argument that the court should decline to exercise jurisdiction and dismiss this action because the available administrative remedies have not been exhausted falls of its own weight where, as we have previously found, the fault for failure to exhaust lies with defendants themselves. Defendants are simply in the position of aggrieved parties who slept on their rights and declined to exhaust administrative remedies; litigants in this posture are not in a position to invoke the doctrine of primary jurisdiction as a defense in litigation to enforce prior administrative rulings which were not appealed. In any case, there is no showing that defendants cannot raise the argument of primary jurisdiction in the state courts as well as our forum.

■ We therefore return to our consideration of the second prong of the twofold test—whether the removing parties will be "denied or cannot enforce" their rights under the Voting Rights Act and the fifteenth amendment in the state courts of Mississippi. Defendants' reliance upon *Hamm v. City of Rock Hill*, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964), is misplaced. In *Hamm*, the state prosecution based upon a state statute was violative of 42 U.S.C. § 2000a–2(c), guaranteeing that no person would be punished for exercising or attempting to exercise his rights under the Public Accommodations Act. Thus, in *Hamm*, unlike here, the mere bringing of the action contravened a federally guaranteed right, and the burden of having to defend such a prosecution would, itself, be a denial of a right explicitly conferred by Act of Congress. Moreover, since state law authorized the prosecution for criminal trespass, there was a formal expression of state law whose application had the effect of absolutely denying the federally protected right asserted in the state courts of South Carolina. The Supreme Court admonished in *Johnson* that

> [e]xcept in the unusual case where "an equivalent basis could be shown for an equally firm prediction that the defendant would be 'denied or cannot enforce' the specified federal rights in the state court," . . . it [is] to be expected that the protection of federal constitutional or statutory rights could be effected in the pending state proceedings, civil or criminal.

421 U.S. at 219–20, 95 S.Ct. at 1595. (our emphasis).

In the case sub judice, it is apparent that there is no statute or formal expression of Mississippi law applicable in the courts of the state which explicitly or implicitly denies the defendants the rights granted to them by the Voting Rights Act and the fifteenth amendment. Nor do we find from the record any circumstances showing that this case presents the unusual situation where "an equivalent basis could be shown for an equally firm prediction" that the defendants would be denied or cannot enforce their rights in the Chancery Court of Marshall County. We have critically examined this record to determine whether there is any evidentiary or legal basis for holding the case is removable under the second prong of *Johnson*'s test. On the facts found and under the firmly established law, as we understand it to be, the defendants have failed to carry the burden of proving the essential requirements for removing this civil action to federal court under § 1443(1). On the contrary, it is clear to us that the objective of the chancery court action is nothing more than a step to restore party discipline and maintain and secure the integrity of free, nondiscriminatory and honest elections in Marshall County.

For the foregoing reasons, the motion to remand is sustained.